06-468

# LEGAL ARGUMENT MEMORANDUM

FILED
OCT -3 2006
U.S. DISTRICT COURT DISTRICT OF DELAWARE
RD Scanned

THE PURPOSE FOR GRANTING THIS [illegible] FOR RELIEF IS BECAUSE OF THE FACT THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED MY MOTION FOR JUDGEMENT OF ACQUITTAL ON ASSAULT IN A DETENTION FACILITY ALLEGED IN COUNT (I.) OF THE DICTMENT AS THE STATE FAILED TO PRESENT SUFFICIENT EVIDANCE THAT I STRUCK C/O SHANNON WITH BODILY FLUID. (SEE IN RE WINSHIP 397 U.S. 358 364 1970.) THE NATION IMPORTANCE OF HAVING THIS COURT DECIDE THE QUESTION INVOLVED IS BECAUSE IF THE LOWER COURT HAD NOT BEEN SO ERRONEOUS THE RESULTS OF THE JUDGEMENT BY THE TRIAL COURT WOULD HAD BEEN DIFFRENT. THE LACK OF GUIDANCE FROM THE COURT ON THESE ISSUES WAS THAT STATE FAILED TO PROVE EVERY ELEMENT OF SUFFICIENT EVIDANCE THAT DEFENDANT "I" STRUCK C/O SHANNON WITH BODILY FLUID, IN BOTH OF THE OFFICERS TESTIMONY THEY STATED; THAY NEVER SAW WHO THREW THE FECIES NOR WERE ANY OF THE 3# OFFICERS ABLE TO POSITIVELY INDENTIFY WHAT CONTAINER WAS USED TO "LUNCH". THE FLUID THAT MAY SUCH CLAIM (SEE A-14, A-7.)

XL Steven Claim in his Testimony that It was A Peanut Butter Jug (see A-14, A-7.) 2.) In Shannon Testimony he Claims It was A Small Peanut Butter Cup That we Received at Lunch-time Thats Given to the Inmates (see A-7.) Then 3.) In David Phillips Testimony he Claims It was A Milk Carton that was at the Incident Seen. But Agian Still theres Not Any Sufficent Evidence to Conclue that there was Ever A Such Thing of somewhat to support Such Claim (see Whitfield v State Del. Supr. Ct. 524 2d 13 16.) And St S. Ct. Rule 901.) But since Inmate Guinn was the only one in the yard, he was Presumed to Be The one Responsibl If the State and Trial Court had Properly examined the State(s) Exhibit Photos with the Feces on the Door(s) and Wall During Trial, that would had seen It could have eazly Been from Another Location By the opening on the Cell Doors, Example! During C/o Shannon M. Testimony on examination he stated there were Little Vent holes at the Bottom of the Doors But Nothing to Reach out and Grab Anything. It's Clearly without merit. During his Testimony ise

Couse the Lower Part of the Doors is About 4 or 5 Inchs on Bothsides of the Doors. Where You Can Eazly Stick You hand out and Possibly Threw Anything of That Shape or Sizeout (see States Exhibit of Fecies on the wall And.) It Could have Eazly been Anybody That Struck C/o Shannon From the Backside of his head, or Back Side side Anywere, including Right side. Officer Shannon Wrote in his Incident Report And testimony at Trial That Guinn threw Liquid at Inmate Hill After he had Exchanged Somewords with hem. In he Thought They was havin A Conversation or whatever, And as he was walkin he was Struck with Fecies. But in his testimony C/o Shannon Nor Neil S. Neverd stated That the Conversation That They was havin was A verble Threating Argument Nor Anything of that Nature That sounded Like They Both Had Any Beef In Fact Durn Both Had Testified They had Never had Any Problems with Inmate Mr. Guinn (see Appendix A-14, 17.) And That They was Not The Intented Target Both Belived Inmate Hill was the Target. (see Appendix A-14, 17.) Further They were Both New to the Tair So They

was ANY Bad Blood Betweun them two. (SEE A-10, 14, 9.) also SEE Booker V. State 929 S.W. 2d 57 (TX. APP-BEAUMONT - 1996.) CARPENTER, 570 A.2d at 206, the State Failed to PROVE EVERY ELEMENT OF COUNT (I.) ASSAULT IN A DETENTION Facility - beyond Reasonable Dubt, Becouse OF the State Failure

The TRial COURT ShouLD have GRANTED GUINAL motion FOR JUDGEMENT OF ACQUITTAL BECOUSE IF I was GRANTED ON MY JUDGEMENT OF ACQUITTAL The outcome out my CONVICTION AND SENTENCIN might would have BEEN DiFFRENT BeCOUSE The LACK OF SUFFICENT EVidence That I STRUCK OFFICER With Bodily FLUID. also (SEE Colorado V. PETTERSON, 532 P.2d 342 345 (COLO. 1975.) ALSO Such above this PEtition Should BE GRANTED RELIEF.

TABLE OF CONTENTS

Page

COURT DOCKET....................................................A-1

INDICTMENT......................................................A-4

MAY 19, 2005
Testimony of Officer Shannon ..........................A-7

Testimony of Officer Stevens ........................A-14

Tsetimony of Officer Phillips .......................A-20

MAY 20, 2005
Argument on Motion for Judgment of Acquittal..........A-25

JULY 1, 2005
Sentencing... .......................................A-28

State of Delaware v. TYRONE L GUINN DOB: 11/12/1984
State's Atty: CARI A VAN DYKE , Esq. AKA: TYRONE H GUINN
Defense Atty: NICOLE M WALKER , Esq. TYRONE H GUINN

Assigned Judge:

Charges:

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|---|---|---|---|---|---|
| 001 | 0411013992 | IN04111483 | ASSLT DET FACIL | TG | 05/20/2005 |
| 002 | 0411013992 | IN04111484 | ASSLT DET FACIL | TNG | 05/20/2005 |
| 003 | 0411013992 | IN04111485 | ASSLT DET FACIL | TNG | 05/20/2005 |

| No. | Event Date | Event | Judge |
|---|---|---|---|
| 1 | 11/23/2004 | CASE ACCEPTED IN SUPERIOR COURT.<br>ARREST DATE: 11/17/2004<br>PRELIMINARY HEARING DATE: 112204<br>BAIL: SECURED BAIL-HELD 6,000.00 100%<br>NO CONDITION | |
| 2 | 11/29/2004 | INDICTMENT, TRUE BILL FILED.NO 117<br>SCHEDULED FOR CASE REVIEW AND ARRAIGNMENT 12/20/04 AT 9:00 | |
| 3 | 12/06/2004 | SUMMONS MAILED. | |
| [illegible] | [illegible] | NOTICE OF SERVICE - DISCOVERY RESPONSE. | |
| 4 | 12/20/2004 | ARRAIGNMENT CALENDAR - 10-C FILED_BY MCDONALD | |
| | 12/20/2004 | CASE REVIEW & ARRAIGNMENT CALENDAR: SET FOR FINAL CASE REVIEW.<br>DATE: 1/18/05 @ 9 | BABIARZ JOHN E. JR. |
| | 01/18/2005 | FINAL CASE REVIEW: NO PLEA/SET FOR TRIAL 5/19/05 | ABLEMAN PEGGY L. |
| | 01/18/2005 | ORDER SCHEDULING TRIAL FILED.<br>TRIAL DATE: 5/19/05<br>CASE CATEGORY: #2<br>ASSIGNED JUDGE (CATEGORY 1 CASES ONLY):<br>UNLESS THE COURT IS ADVISED WITHIN 2 WEEKS OF THE UNAVAILABILITY OF NECESSARY WITNESSES, THE COURT WILL CONSIDER THE MATTER READY FOR TRIAL. ABSENT EXCEPTIONAL CIRCUMSTANCES, RESCHEDULING OR CONTINUANCE REQUESTS WILL BE DENIED. | ABLEMAN PEGGY L. |
| 6 | 04/14/2005 | DEFENDANT'S LETTER FILED. | |

State of Delaware v. TYRONE L GUINN DOB: 11/12/1984
State's Atty: CARI A VAN DYKE , Esq. AKA: TYRONE H GUINN
Defense Atty: NICOLE M WALKER , Esq. TYRONE H GUINN

| No. | Event Date | Event | Judge |
|---|---|---|---|
| | | TO: LAWRENCE SULLIVAN<br>DEFENDANT WANTS A NEW ATTORNEY ASSIGNED TO CASE. | |
| 7 | 04/26/2005 | SUBPOENA(S) MAILED. | |
| 8 | 05/05/2005 | STATE'S WITNESS SUBPOENA ISSUED. | |
| 9 | 05/11/2005 | TRANSCRIPT FILED.<br>PRELIMINARY HEARING-NOVEMBER 22,2004<br>BEFORE COMM.MARY MCDONOUGH | |
| | 05/19/2005 | TRIAL CALENDAR- WENT TO TRIAL JURY | JOHNSTON MARY MILLER |
| 10 | 05/20/2005 | CHARGE TO THE JURY FILED. | JOHNSTON MARY MILLER |
| 11 | 05/20/2005 | JURY TRIAL HELD BEFORE JUDGE JOHNSTON 5/19-5/20/05.<br>ON 5/20/05, THE DEFENSE MADE A MOTION FOR A JUDGEMENT OF ACQUITTAL<br>ON ALL 3 COUNTS. THE MOTION WAS DENIED.<br>THE JURY BEGAN DELIBERATIONS ON 5/20/05. THE JURY RETURNED ON 5/20/05<br>WITH VERDICTS OF: ASSAULT IN A DETENTION FACILITY (1483) GUILTY;<br>ASSAULT IN A DETENTION FACILITY (1484) NOT GUILTY- JUDGE JOHNSTON<br>DECLARED THIS CHARGE NOT GUILTY; THE JURY COULD NOT AGREE ON A VERDICT<br>[illegible]<br>[illegible] PRE-SENTENCE INVESTIGATION IS ORDERED. SENTENCING WILL [illegible]<br>ON JULY 1, 2005 @ 9:30.<br>STATE'S ATTORNEY: CARI VAN DYKE<br>DEFENSE ATTORNEY: NICOLE WALKER<br>COURT REPORTER(S): PATRICIA GANCI/JEANNE CAHILL<br>COURT CLERK(S): MARIE CARUSO/JENNIFER HOUSTON/ANGELA HAIRSTON/<br>ANTHONY IANNELLI<br>EVIDENCE IS STORED IN THE VAULT | JOHNSTON MARY MILLER |
| | 07/01/2005 | SENTENCING CALENDAR: DEFENDANT SENTENCED. | JOHNSTON MARY MILLER |
| 12 | 07/01/2005 | SENTENCE: ASOP ORDER SIGNED AND FILED 7/14/05 | JOHNSTON MARY MILLER |
| 13 | 07/19/2005 | LETTER FROM SUPREME COURT TO KATHLEEN FELDMAN, COURT REPORTER<br>RE: A NOTICE OF APPEAL WAS FILED ON JULY 13, 2005.<br>THE TRANSCRIPT IS DUE AUGUST 22, 2005.<br>313, 2005 | |
| 14 | 08/01/2005 | LETTER FROM SUPREME COURT TO COUNSELOR NICOLE WALKER, ESQ. | |

ate of Delaware v. TYRONE L GUINN
DOB: 11/12/1984
State's Atty: CARI A VAN DYKE , Esq.
AKA: TYRONE H GUINN
Defense Atty: NICOLE M WALKER , Esq.
TYRONE H GUINN

| No. | Event Date | Event | Judge |
|---|---|---|---|
| | | RE: THE NOTICE OF APPEAL FILED ON JULY 13, 2005. DOES NOT COMPLY WITH SUPREME COURT RULE 7(C)(9). JUDGE JOHNSTON'S JULY 1ST SENTENCING ORDER MUST BE ATTACHED TO THE APPEAL. | |
| 15 | 08/03/2005 | TRANSCRIPT FILED. TRIAL-MAY 20,2005 BEFORE JUDGE JOHNSTON AND JURY RPR-JEANNE CAHILL | |
| 16 | 08/17/2005 | TRANSCRIPT FILED. TRIAL-MAY 19,2005 BEFORE JUDGE JOHNSTON AND JURY P.GANNI,RPR | |
| 17 | 08/17/2005 | TRANSCRIPT FILED. SENTENCING-JULY 1,2005 BEFORE JUDGE JOHNSTON P.GANNI,RPR | |
| | 08/23/2005 | RECORDS SENT TO SUPREME COURT. 313, 2005 | |
| 18 | 08/29/2005 | [illegible] 313, 2005 | |

*** END OF DOCKET LISTING AS OF 09/22/2005 ***
PRINTED BY: JDEFDAB

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | I.D. No. 0411013992 |
| | ) | |
| TYRONE GUINN | ) | |
| | ) | |
| Defendant. | ) | |

The Grand Jury charges Tyrone Guinn with the following offenses:

COUNT I. A FELONY IN # 04-11-1483

**ASSAULT IN A DETENTION FACILITY**, in violation of Title 11, Section 1254 of the Delaware code of 1974, as amended.

**TYRONE GUINN**, on or about the 30th day of June, 2004, in the County of New Castle, State of Delaware, while being confined in a detention facility, did intentionally strike Officer Shannon with urine, feces, or other bodily fluid, a guard at the facility who was acting in the lawful performance of his duties.

COUNT II. A FELONY IN # 04-11-1484

**ASSAULT IN A DETENTION FACILITY** in violation of Title 11, Section 1254 of the Delaware Code of 1974, as amended.

**TYRONE GUINN**, on or about the 30th day of June, 2004, in the County of New Castle, State of Delaware, while being confined in a detention facility, did intentionally strike Officer Stevens with urine, feces, or other bodily fluid, a guard at the facility who was acting in the lawful performance of his duties.

<u>COUNT III. A FELONY</u> <u>IN 3 04-11-1485</u>

**ASSAULT IN A DETENTION FACILITY**, in violation fo Title 11, Section 1254 of the Delaware Code of 1974, as amended.

**TYRONE GUINN**, on or about the 30th day of June, 2004, in the County of New Castle, State of Delaware, while being confined in a detention facility, did intentionally cause physical injury to Neil Stevens, a correctional officer acting in the lawful performance of his duties.

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,

Plaintiff,

v. IN04111483

TYRONE L. GUINN,

Defendant.

BEFORE: HONORABLE MARY M. JOHNSTON, J. and jury

APPEARANCES:

CARI VAN DYKE, ESQ.
DEPARTMENT OF JUSTICE
for the State

NICOLE M. WALKER, ESQ.
OFFICE OF THE PUBLIC DEFENDER
for the Defendant

TRIAL TRANSCRIPT
MAY 19, 2005

PATRICIA L. GANCI, RPR, CRR
SUPERIOR COURT OFFICIAL REPORTERS
500 N. King Street, Suite 2609, 2nd Floor
Wilmington, Delaware 19801-3725
(302) 255-0653

I N D E X

TESTIMONY OF MALCOLM SHANNON
Direct Examination by Ms. Van Dyke.........12
Cross-Examination by Ms. Walker............37
Redirect Examination by Ms. Van Dyke.......49
Cross-Examination by Ms. Walker............52
Redirect Examination by Ms. Van Dyke.......58

TESTIMONY OF NEIL STEVENS
Direct Examination by Ms. Van Dyke.........59
Cross-Examination by Ms. Walker............79
Redirect Examination by Ms. Van Dyke.......94
Cross-Examination by Ms. Walker............96
Redirect Examination by Ms. Van Dyke.......97

TESTIMONY OF DAVID PHILLIPS
Direct Examination by Ms. Van Dyke.........98
Cross-Examination by Ms. Walker...........111
Redirect Examination by Ms. Van Dyke......122
Cross-Examination by Ms. Walker...........124

- - - - -

May 19, 2005
Courtroom No. 8E
11:45 a.m.

PRESENT:

As noted.

- - - - -

(Whereupon, jury enters the room at 1:51 p.m.)

THE COURT: Good afternoon, ladies and gentlemen.

Ms. Van Dyke, are you ready to proceed?

MS. VAN DYKE: Yes, Your Honor. May it please

RECEIVED AUG 1 8 2005

Good afternoon, ladies and gentlemen. My name is Cari Van Dyke. I'm a Deputy Attorney General. I represent the people of the State of Delaware. This is my time now to give you an opening statement, which is basically an introduction to the case, and I'd like to start by telling you that individuals who commit crimes and are later convicted of those crimes oftentimes go to prison. They go to prison because they have chosen to not abide by the law. Even when the individuals are incarcerated for those criminal offenses, they choose to still continue to not abide by the law. So, yes, when people are incarcerated, they do commit crimes in prison and the State prosecutes them just as if it had happened on the city streets.

The defendant in this case is Tyrone Guinn. He is sitting at the far table next to his attorney. On June 30th, 2004, Tyrone Guinn was a sentenced inmate at the Delaware Correctional Center in Smyrna, Delaware. He was -- as a sentenced inmate, he was secured in what's called, what we refer to as the SHU. It's the Secured Housing Unit. It's a super max detention facility.

. While he's at this facility, there are

strict guidelines. As in any prison, there are strict rules that must be followed not only by the inmates, but by the correctional officers. And in this super maximum security prison, there are rules that inmates don't have contact with other inmates. They are housed individually. They eat in their cells. They shower individually. They go to the recreation yard individually, and they do not have contact with one another. At all times when they leave their cell or if they leave the recreation yard, they are escorted by two guards which are correctional officers.

On June 30th, 2004, Tyrone Guinn at some point was secured in what's called an interior recreation yard. It's not outside. It's inside the building, but it's a yard in which he can exercise, walk around. He's not cuffed. He uses that yard. And while he's secured in there alone, not with any inmates, Officer Shannon, Malcolm Shannon, and Officer Neil Stevens are escorting another inmate. They are escorting this inmate from his cell to the shower area. And it's two guards, and this inmate is also cuffed behind his back as he's walking.

And as they're walking, they're walking down a very narrow hall, probably about six feet in width. And

A. As soon as I come in, first thing, probably be briefed by the officers that were there previously, just what went on during the course of the day, anything, you know, just a heads-up for everything. Basically, after that, get a count for all the inmates, make sure everybody's there. From there we go onto feeding. That takes about a half an hour out of our time, 45 minutes out of the time. Then after that, that's when we start recreation, and usually we do about six cells at a time. And between that, that takes about an hour and 45 minutes, two hours to go ahead and do two tiers at the same time. And we bring them in for showers, phone calls, if there is something going on, and basically after that, it's just keeping up on our area checks.

Q. Okay. Thank you.

How are the tiers laid out? You said you have two tiers that you had to supervise on the 30th. Can you explain, are those tiers one on the bottom level, one on the top level?

A. Yes. Well, each tier has two levels that has 12 cells on each level. And there's only one inmate to each cell.

Q. Okay. If you don't mind, to assist the jury,

with permission of the Court, I'd like to have the officer step down and possibly draw a sketch.

MS. WALKER: No objection.

THE COURT: All right.

BY MS. VAN DYKE:

Q. If you don't mind drawing a sketch of the tier layout that you were in charge of on that night, on the 30th.

A. This is just basically just a bottom level. There's another level that's just like this.

Q. This would be the bottom level?

A. This is the bottom level tier. When you come in through the sliders, first thing is you have -- cells 1 through 10 and 11 to 12 are, like, facing towards the security yard the inmates, they go and have their recreation in. That's fenced in all around them.

Q. How many of those are there?

A. It's two yards on the inside.

Q. Two yards?

A. And it's three on the outside. But most time they only use two on the outside, but for the inside there's only two.

A. There's two.

Q. Three on the outside?

A. Right.

Q. And then you have 12 inmate cells?

A. Right, for the bottom level. There's 12 for the top. It's the same format.

Q. Okay. And what is the -- it says Yard 2 off to the left. That is the second yard?

A. Yeah, that's the second yard. That's how we have to label it.

Q. That's all right. No, you're doing very well. Where is Tyrone -- do you know Tyrone Guinn?

A. Yes.

Q. Could you please tell the Court where his cell is located?

A. His cell at the time was located here, at Cell 9.

Q. Cell 9. Okay. Why don't you go ahead back and take a seat?

Okay. Now, after you drew that diagram, could you please tell the jury what procedures you must follow at all times when moving inmates out of their cell?

A. Removing a SHU inmate from the cell, it must be

two officers present and the inmate must be cuffed from behind at all times. And when leaving the tier, they must be shackled for rec purposes -- recreational purposes. When they go to outside yards, whatever, shackles aren't really needed. But usually it's just being handcuffed from behind, and then you're allowed to bring out just a laundry bag or just clothing for whatever they want to put on when they come out the shower. And that's all.

Q. Okay. Now, is that procedure followed at all times when they leave their cell?

A. Yes.

Q. And do you have -- what is a normal uniform for you? Is that what you have on or a little different?

A. No, we have kind of a little different uniform. It's an old maximum uniform, but it becomes just another substitute for this, you know, just for comfortability reasons.

Q. So you don't have all of the shield on?

A. No, the shield is just a patch and it's basically BTUs, like Army BTUs.

Q. So it's more comfortable clothing for you?

A. **It's completely fenced, and towards the back of the yard is a concrete wall with probably a little window. And that's about it. Mostly it's just plain fence.**

Q. Okay. How about the cells directly across from the yard, are all of the cells on that tier?

A. **Yes.**

Q. What are they made of and do you have any openings?

A. **No, there's no openings. Just still iron doors, and there's probably like a little vent -- little holes at the bottom. But, you know, nothing to reach out or grab really like that.**

Q. Okay. So when you open up a cell, that's basically how you cuff an inmate. You have to actually open up the door --

A. **No. Actually, it goes through the pod officer. We have a pod, and it's operated by a panel that you press buttons to open the doors.**

Q. Okay. You mentioned a pod. Can you explain to the jury what the pod is?

A. **Well, that's the control center of the whole -- the entire building. You know, every door is controlled**

**by an officer. You know, nothing can be -- it can be opened with a key, but everything is done by a button, by pushing a button.**

Q. Okay. Now, when you were walking Ernest Hill down to the shower, he was cuffed, correct?

A. **Yes.**

Q. And how about Tyrone Guinn? When he was in the yard, was he cuffed?

A. **No, they aren't in the yard cuffed.**

Q. So his hands are free and he's free to move about the yard?

A. **Yes.**

Q. What is the size of the yard, approximately, if you know? If you don't know, I don't want you guessing.

A. **I don't know. It's fairly large.**

Q. Now, what would you say the approximate distance -- you described this narrow hallway. I mean, the yard is directly along that hallway?

A. **Yes, it's right along. It's right there. You can just easily walk to the fence.**

Q. Now, you said the feces, do you know what direction it came from?

A. **Yes.**

Q. And where did it come from?

A. **It came from our right side.**

Q. But where did it really come from?

A. **It came from Yard 2.**

Q. Okay. And did you actually physically see Tyrone Guinn throw --

A. **No.**

Q. -- the feces?

A. **No, I didn't.**

Q. What did you -- what was your first thought when this happened to you?

A. **I was -- I was stunned because I couldn't believe it was actually human feces on my body. So I really didn't know what was going on, but after I gained some kind of sense, I knew I had to secure. The first thing to do all the time is to secure. So the first thing I did was to secure Ernest Hill in the shower because that was the closest place to me.**

Q. And did Officer Stevens help you do that?

A. **Yes.**

Q. Okay. And once you secured him in the shower area, what do you do next?

A. **After that, Officer Stevens went to go get**

**Inmate Guinn and I assisted him with that. And we -- he cuffed up from there in the yard, and we brought him to the cell.**

Q. Okay. You cuffed Tyrone Guinn?

A. **Yes.**

Q. How were you able to accomplish that with him in the yard?

A. **Well, there's a little panel to drop down to allow them to put their wrists through. It's a little flap.**

Q. And you were present when that happened?

A. **Yes.**

Q. And you still meanwhile have all of this stuff --

A. **Yes.**

Q. Feces running down your side?

A. **Yes.**

Q. Okay. Could you describe the hallway? Was it covered in any way with the feces?

A. **Yes, the floors were covered in feces. It was very liquidy. The walls by probably around like cell 3 or 4, the walls were covered. Some cell doors were and the fences.**

Q. As a part of the investigation that took place, did you speak to Officer, or Investigator Drake about that, what happened to you?

A. **Yes, I believe discussing matters and that was about it. And, you know, he just helped me out with, you know, just a whole understanding of things. That's about it.**

Q. Okay.

MS. VAN DYKE: May I have a moment, Your Honor?

THE COURT: Yes.

MS. VAN DYKE: Thank you.

Nothing further of this witness, Your Honor.

CROSS-EXAMINATION

BY MS. WALKER:

Q. Good afternoon, Officer.

A. **How are you doing?**

Q. So you work for the Department of Corrections, right?

A. **Yes, ma'am.**

Q. And you have been there a year and five months?

A. **Yes.**

Q. Now, that would make it, if my math is correct, was it June 30th when this incident allegedly occurred?

A. **Yes.**

Q. You would have been there about six months?

A. **Right.**

Q. So you were relatively new to the job, correct?

A. **Yes.**

Q. Still learning the ropes, what you're supposed to do, all of that jazz?

A. **Somewhat.**

Q. Okay. And you were in a pretty -- a part of the prison that has a lot of pretty tough guys, right?

A. **Right.**

Q. Okay. You indicated that you were escorting Mr. Hill. Is that right?

A. **Yes.**

Q. And you were on the outside of the fence of Yard 2?

A. **Uh-hmm.**

Q. You didn't look over towards Yard 2, but something splattered you on the back, right?

A. **Right.**

Q. Now, you indicated that you got the feces on your face?

A. **Right.**

Q. But you didn't get it in your mouth?

A. **Right.**

Q. You didn't get it in your eyes, and you were facing forward, correct?

A. **Right.**

Q. Away from the feces?

A. **Right.**

Q. So more accurately, you got hit in the head?

A. **No, I was hit from across, from the direction I was walking. I was walking as if my head was tilted this way, and when it came across, it was in a motion like this.**

Q. Okay. But you said you were looking forward is what I thought you said earlier?

A. **Right, I was looking forward.**

Q. Now, you know, I know you said from the witness stand and the jury box was how far the walk is. Is that right?

A. **No, no, no. I meant as far as the width of the -- the width of the walkway.**

Q. Okay.

A. **That's what I meant.**

Q. Okay. How far away were you from the fence of

the yard? Do you know?

A. **About two feet.**

Q. Two feet. Okay. Do you know -- do you have any idea where -- how Mr. Guinn had feces in the rec yard?

A. **Well, after we had -- after I had placed Mr. Hill inside the shower, I did see that there was a cup laying on the floor.**

Q. Okay.

A. **And it's usually the cup that's given to them some time around lunchtime. Sometimes they get peanut butter, and there was a peanut butter cup that was laying on the ground.**

Q. Now, these guys, like I said, you're in a tough part of the prison. It's important, obviously, for you to keep a close eye on all of these individuals for contraband, right?

A. **Right.**

Q. A little earlier you testified that Mr. Guinn went out into the yard with his clothes?

A. **Right.**

Q. You didn't say anything about a cup at that time, did you?

A. **Right.**

Q. And I would assume you checked the yard to make sure before an inmate goes out there that there's no contraband lying around. Would that be correct?

A. **Yes.**

Q. And did you bring the cup with you today?

A. **No.**

Q. It wasn't taken into evidence?

A. **I'm not sure.**

Q. You're not aware of that?

A. **All I do is take him. I had nothing to do with it.**

Q. Okay.

Now, in your -- you recall making -- writing an incident report?

A. **Yes.**

Q. I think you referred to that. Do you have a copy of that with you?

A. **Yes.**

Q. You do?

A. **Yes.**

Q. Can you take that out and take a look at it for me?

A. **Sure.**

Q. I'm going to give you a couple of seconds to just read it over to yourself and then ...

Okay. If you look at the second sentence, which says, I'll read it and you can tell me if it's accurate: While walking by Yard 2 with Inmate Hill, it's blacked out on my copy, but is that correct?

A. **Okay. Yes.**

Q. Inmate Guinn took a container out of his jumper and threw liquid at Inmate Hill. Is that right?

A. **Yes.**

Q. Okay. So from that you had concluded that it was Inmate Hill that he was trying to hit. Is that correct?

A. **Yes.**

Q. Okay. He wasn't trying to hit you; it just happened you were in the wrong place at the wrong time?

A. **(Witness indicating.)**

Q. Okay.

MS. VAN DYKE: Your Honor, may we approach?

THE COURT: Yes.

(Whereupon, the following sidebar conference was held.)

MS. VAN DYKE: The State in this case was not -- obviously, the defendant was interviewed in this case. The State did not intend on offering his statement. The incident report that Ms. Walker's referring to basically includes, you know, some conclusions based on the defendant's statement because if -- the testimony Officer Shannon had said is that he didn't see him throw it. How did he know it was in his jumpsuit? The only reason we know that is because of the defendant's statement. I'm concerned about hearsay statements basically, essentially, in that report.

MS. WALKER: First of all, Your Honor, looking at the report, it does not say Mr. Guinn told me that he intended to hit somebody else. He wrote a report based on evidence that he had. It's a conclusion that he wrote. He made it. That's not hearsay at all. If it had said Guinn said such and such, he had drawn a conclusion. We don't know how he had drawn the conclusion.

THE COURT: Are you going to ask him how he drew his conclusion?

MS. WALKER: No, she can do that -- it's a question of -- for the jury.

MS. VAN DYKE: Your Honor, it also calls for speculation, too, because how is he to know how the inmate --

MS. WALKER: He put it in his report. That's the basis of this investigation. I think that's a fair question to ask him, what he put in his report. What he based it on is what he based it on. That's a question to put in front of the jury. Additionally, even if she's complaining that it is hearsay, it's an exception to the hearsay rule under 803(3) because it goes to Mr. Guinn's state of mind as to intent and, therefore, it's an exception.

MS. VAN DYKE: It's an admission of the party opponent that the defendant cannot use unless he takes the stand.

THE COURT: Well, just a moment. Let's go back to the 803(3).

MS. WALKER: 3.

THE COURT: It is a conclusion as to his state of mind, but it's not a statement as to his state of mind.

MS. WALKER: Well, she can't have it both ways, Your Honor. If it's a conclusion he made, I can

properly examine him on it because he put it in the report. If she's saying, no, she can't question him on the basis of the conclusion because it's hearsay, then she can't have that either because of 803(3).

THE COURT: Well, the conclusion that he's reached I think is admissible.

MS. WALKER: Okay.

THE COURT: The question is --

MS. WALKER: I'm not going to ask him if he said anything.

THE COURT: But what are you going to ask him then with regard to the basis of his conclusion?

MS. VAN DYKE: I don't think it developed enough for me to at this point say what I would ask him. My concern is that it's bringing in evidence that the only way the witness knew it was because of defendant's statement. And that's my concern.

THE COURT: All right. Well, he hasn't testified to that yet, and he has not yet indicated that he's going to. If he does, we'll handle the hearsay issue at that point.

MS. WALKER: Absolutely.

THE COURT: But I don't think it's admissible

as to defendant's state of mind unless it is...

MS. WALKER: The point I'm trying to get is his intent, what was his intent.

MS. VAN DYKE: The defendant has --

MS. WALKER: And 803(3) is immaterial whether the witness is available. It goes to state of mind.

THE COURT: Just a moment.

Well, it depends on when the statement was made. I mean, if he made the statement too far after the fact --

MS. WALKER: He made it that day when he was interviewed.

THE COURT: Well, that may not be close enough in time to get to the 803(3). Just because it goes to intent doesn't make it automatically admissible under 803(3). So if you're even thinking about that, we have to go outside the presence of jury and talk about that.

MS. VAN DYKE: I'm sorry, I guess this a premature objection.

THE COURT: That's all right.

MS. WALKER: I just want to make sure I can ask him about the conclusions. If she wants to question him about what he said, then we come back to you?

THE COURT: Right.

MS. WALKER: Thanks.

(Sidebar conference was concluded.)

BY MS. WALKER:

Q. All right, Officer. The last thing you had indicated was that you had put in your report that Mr. Guinn took the container out of his jumper and threw it at Inmate Hill and missed him and hit you. Is that right?

A. **Right.**

Q. Okay. And everything you would put in your report would be accurate and truthful. Is that correct?

A. **Yes.**

Q. And you wouldn't mislead anybody with the incident report, would you?

A. **No.**

Q. Okay. Additionally, when you were talking -- when you go onto explain the situation when they were cuffing him, you indicate that there was a tussle. Is that right?

A. **Yes.**

Q. And, now, Officer Stevens received a cut to his ring finger and pointer finger?

A. **Right.**

Q. Now, I believe your testimony was that that was a result of the handcuffs. Is that right?

A. **Yes.**

Q. And it was a result of trying to put the handcuffs back on Mr. Guinn?

A. **Right.**

Q. And the reason that there was this tussle that ensued was that Mr. Guinn was pulling away?

A. **Right.**

Q. So Mr. Guinn didn't -- wasn't attacking the officer. Is that right?

A. **No, he wasn't attacking.**

Q. He was trying to pull away from what -- your best -- your perception of the situation was that Mr. Guinn was trying to get away and that's why he had to be subdued?

A. **Right.**

Q. Were the clothes packaged and put into evidence at all? Do you know?

A. **Yes, ma'am.**

Q. Okay. Do you have those with you today?

A. **No, they're not here.**

Q. You do not. Do you know whether this, I guess, concoction or the fluid, the feces, that's being purported by the prosecutor, was that ever tested? Do you know?

A. **No. Well, I'm not sure, so...**

Q. So you don't know?

A. **I don't know.**

Q. Okay. And you didn't have to see a nurse or anybody with respect to --

A. **I did see a nurse at the time, but she says as long as it didn't get into like my eyes, my ears, or my mouth, she said then everything should be fine.**

Q. You were okay?

A. **Yes.**

Q. Okay.

MS. WALKER: I have nothing further, Your Honor.

REDIRECT EXAMINATION

BY MS. VAN DYKE:

Q. Physically, you're okay, but how did you feel when that happened to you?

A. **Humiliated, and it just -- it felt unhuman.**

Q. Humiliated and unhuman?

A. **Yes.**

Q. Now, Ms. Walker referred to your incident report that you wrote up after the incident took place, and you said that the -- in your report you referred to the container was taken -- Guinn took the container out of his jumper and threw the liquid, basically?

A. **Right.**

Q. At Inmate Hill?

A. **Yes.**

Q. Okay. Was that an assumption that you made at that time?

A. **Yes, at the time it is -- it was an assumption because we keep the bags, their clothes, and everything. We keep all of the articles outside of the yard. So it is evident he didn't have anything in his hand when he came out. So it had to come from in the jumper.**

Q. Okay. Was Ernest Hill struck?

A. **No.**

Q. Okay. How close were you to Ernest Hill?

A. **He was right beside me.**

Q. Okay. Directly beside you?

A. **Yes.**

Q. Would you say that you were almost touching

each other or were you touching each other?

A. **No, we weren't touching each other. There was the proper space between us.**

Q. Okay. How much space?

A. **He was probably about right here.**

Q. And you said he, to your knowledge, did not have any feces on him?

A. **No.**

Q. Anything on him. Okay.

Now, this container that we assume was the container that collected the feces by Mr. Guinn, Tyrone Guinn, is that considered contraband?

A. **Well, if it's kept in the room, yes, it is considered contraband. It is not used for its purpose and then thrown away, it's contraband.**

Q. Now, is this a large cup? Small cup? Can you describe?

A. **The cup is about, probably about this size right here.**

Q. Okay. And you said he took a number of boxer shorts, articles of clothing?

A. **Yes.**

Q. And he also had a jumpsuit on?

A. **Yes, he had a jumpsuit and sweatshirt on.**

Q. And your assumption was that he concealed that?

A. **Yes.**

Q. In the uniform?

A. **Yes.**

**MS. VAN DYKE: Thank you.**

**MS. WALKER: Just a couple on re-cross, Your Honor.**

CROSS-EXAMINATION

BY MS. WALKER:

Q. I think you testified earlier that the -- that Yard 2 was on your right-hand side, correct?

A. **Yes.**

Q. And I guess Mr. Hill then was on your left-hand side?

A. **Yes.**

Q. And you got struck on your right-hand side?

A. **Yes.**

Q. Okay. And Officer Stevens was behind you?

A. **Yes.**

Q. So his right-hand side was also facing the yard?

A. **Yes.**

is drafted.

MS. VAN DYKE: In some way it's work product because they follow their own administrative charges, and I'm not comfortable with it being in front of a jury.

THE COURT: I'm going to retain this and hold my ruling until I've had a chance to look at this.

MS. VAN DYKE: Thank you, Your Honor.

(Sidebar conference was concluded.)

BY MS. WALKER:

Q. You indicated that you had had a previous contact with Mr. Guinn?

A. Yes.

Q. And there was no problems between the two of you?

A. No.

Q. Okay. So when you drew the conclusion that you drew, it was based on what you knew about the two inmates and yourself and your relationships, correct?

A. I said as far as what?

Q. Well, he didn't have any problems with you that you know of, correct?

A. Right.

Q. And you drew the conclusion he was throwing it at the other inmate because why?

MS. VAN DYKE: Object, Your Honor.

MS. WALKER: Actually, I'll withdraw the question.

BY MS. WALKER:

Q. You drew that conclusion. Is that correct?

A. I mean, I have no previous history of, you know, if they did have any problems.

Q. Okay.

MS. WALKER: Thank you. Nothing further.

MS. VAN DYKE: Just prompted a question.

REDIRECT EXAMINATION

BY MS. VAN DYKE:

Q. Were you aware of whether or not the defendant and Ernest Hill had any problems?

A. No.

MS. VAN DYKE: Okay. Thank you. Nothing further of this witness, Your Honor.

THE COURT: You may step down.

You may call your next witness.

MS. VAN DYKE: Thank you. The State would call Officer Neil Stevens.

THE COURT: Perhaps, we should take a five-minute recess before we put Officer Stevens on the stand.

(Whereupon, jury leaves the room at 2:49 p.m.)

THE COURT: We'll reconvene in five minutes.

(Recess taken.)

THE COURT: Please bring in the jury.

(Whereupon, jury enters the room at 3:03 p.m.)

THE COURT: You may call your next witness.

MS. VAN DYKE: Officer Neil Stevens, Your Honor.

THE COURT: Do we need the diagram?

MS. VAN DYKE: No, we do not.

THE COURT: All right. We can move that then.

NEIL STEVENS, having duly been sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. VAN DYKE:

Q. Good afternoon, Officer Stevens.

A. Hello.

Q. With whom are you employed?

A. Delaware Correctional Center.

Q. And how long have you been an employee at

Delaware Correctional Center?

A. Five years.

Q. Do you mind me asking how old you are?

A. 26.

Q. In what capacity do you work with the Delaware Correctional Center?

A. What -- I don't understand. Capacity?

Q. What is your position with --

A. I'm a correctional officer.

Q. Have you always maintained that position?

A. Yes, ma'am.

Q. Since your employment began?

A. Yes, ma'am.

Q. And what are your current duties and responsibilities, if you can describe it briefly for the jury?

A. Just do routine checks, make sure inmates aren't getting out of line, recreation, feeding of inmates.

Q. Okay. And have you received any specialized training in that area to do your job, to perform your job?

A. The academy, that's about it.

A. **At that moment, yes, ma'am.**

Q. Okay. Are inmates permitted to carry personal items into the yard?

A. **No, ma'am.**

Q. Okay. How about like their boxers, shoes, shower shoes?

A. **Shower stuff, they normally put that on the outside of the yard. They leave it on the outside of the yard or they place it on the shower that they're going to receive the shower at.**

Q. Okay. So they're not permitted to have anything inside the yard?

A. **No, ma'am.**

Q. Okay. So you don't recall seeing Inmate Guinn carrying anything?

MS. WALKER: Objection, Your Honor. Asked and answered.

THE COURT: I'll allow one more question. Go ahead.

MS. VAN DYKE: I'm sorry, Your Honor?

THE COURT: Go ahead. You may ask that question.

BY MS. VAN DYKE:

Q. Do you recall him carrying anything, container, anything?

A. **At any point?**

Q. Uh-hmm.

A. **Yes, there was a container, almost looked like a peanut butter jug or something in that manner.**

Q. Why do you refer to it as a peanut butter jug?

A. **Because that's what it looked like. It looked like a peanut butter container or maybe a juice container.**

Q. What was the size? You did that, so...

A. **Just probably about maybe this tall, that round.**

Q. When did you observe that container?

A. **After he -- after Officer Shannon got hit by the feces and urine.**

Q. Okay. All right. We're going to get to that right now. At what point -- what were you doing prior to that incident occurring? What were you and Officer Shannon doing?

A. **Removing another inmate from his cell.**

Q. And who was that inmate?

Q. Okay. And where were you taking that inmate?

A. **To the shower.**

Q. Okay. And in the process of taking him to the shower, where is Tyrone Guinn at this time?

A. **In Yard 2.**

Q. Okay. And why don't you lead the jury through your -- what happened, the process?

A. **Well, Mr. Hill was removed from lower 10. I was behind Officer Shannon and Inmate Hill. Then I heard something, looked up, and Officer Shannon had feces and urine just running all down his face, all over his face, the back of his head, all over the right side of his body.**

Q. Okay. How did you know it was feces and urine?

A. **You could smell it.**

Q. Could you -- you could also see it, right?

A. **Yeah, I could see it.**

Q. Okay. Did it go anywhere else?

A. **I had a little bit on my right pant.**

Q. What do you mean by "a little bit"?

A. **A splatter.**

Q. Okay. And where on your pant leg was it?

A. **About the knee level on the right-hand side.**

Q. Okay. Was it on the back? The side?

A. **It was on the side.**

Q. Okay. And predominantly where would you say Malcolm Shannon, Officer Shannon, was hit on the --

A. **All on his right-hand side and on the backside of his right-hand side.**

Q. Okay. And what direction?

A. **It came from our right.**

Q. Okay. And what is -- what is the only --

A. **Yard 2.**

Q. Is that the only thing to your right?

A. **Yes, ma'am.**

Q. And who was in Yard 2?

A. **Inmate Guinn.**

Q. Was anyone else in that yard?

A. **No, ma'am. He was the only person out besides Mr. Hill, and he was handcuffed behind his back.**

Q. Okay. Was Tyrone Guinn, was he cuffed at any point when he was in the yard?

A. **In the yard until we take him off at the flap. That's maybe a period of five seconds.**

Q. Okay. So when he's in the yard, he's uncuffed?

Q. Did you actually see Tyrone Guinn throw anything?

A. **No, ma'am.**

Q. Okay. Do you recall whether or not Ernest Hill, the other inmate that you were escorting, whether or not he had any feces/urine on him?

A. **I do not recall. I don't believe so.**

Q. How far away would you say Officer Shannon was from the recreation yard?

A. **Well, on the walkway, I mean, there's only maybe a space of four-feet wide to walk in between the wall and the yard fence. So not far.**

Q. Okay. Do you recall seeing Inmate Guinn in the yard?

A. **Yes, ma'am.**

Q. Okay. Do you remember seeing him at any particular location at any time in the yard?

A. **All over it pretty much.**

Q. How about when you were escorting Ernest Hill, did you take any particular -- pay any particular attention to Tyrone Guinn at that point?

A. **Not until after the incident. I looked up, and he was maybe three or four feet back from the fence.**

Q. Okay. Three or four feet back from the fence?

A. **Yes, ma'am.**

Q. Did he have anything in his hand?

A. **The container.**

Q. Could you tell the jury what your observations were of Officer Shannon, like the way he responded to what happened?

A. **Mr. Shannon was -- he was in complete shock. I mean, he was just in complete shock, probably denial that he had feces and urine on his face and running -- dripping down his ears and hair.**

Q. And what about you, what were you thinking at that time?

A. **I felt bad for him.**

Q. What was the thought that you had at that point once you realized the incident occurred? What did you do next?

A. **I told Mr. Shannon to take Mr. Hill to the shower, secured him in there, and then I told Mr. Guinn to cuff up. And he did.**

Q. What does "cuff up" mean?

A. **Back up to the flap on the yard, place his hands out of it, and let me handcuff him so that we can take him out of the yard.**

Q. Okay. And he was compliant in doing that?

A. **Yes, he was compliant.**

Q. And meanwhile, where is Officer Shannon?

A. **Shannon, Officer Shannon, had come back to me.**

Q. Okay. So he had to actually go on his own with Inmate Hill?

A. **It was only a couple more steps from where they were at.**

Q. Okay. And was there any necessity as to why you needed to cuff Tyrone Guinn at that time?

A. **It's just better to take care of a situation right away if you can.**

Q. Why is that?

A. **This way he doesn't have time to do something else.**

Q. You said that he was compliant in cuffing him. What was your next step at that point?

A. **To take him out of the yard and place him back in his cell.**

Q. And where is his cell in relation to the yard?

A. **Straight across, pretty much.**

Q. And was Officer Shannon back with you?

A. **Yes, ma'am.**

Q. Okay. And how -- could you explain to the jury the process that you went through to get Tyrone Guinn back into his cell?

A. **I cuffed him at the flap in the yard. Removed him from the yard. Brought him back to his cell. When we bring him back to his cell, went to take one cuff off, and he pulled away. As soon as he pulled away, just restrained him. Took him down. Put the cuff back on his right wrist, and then removed him from the cell, and brought him out to the interview room.**

Q. You said "he." When you started to take the cuff off of his one hand, is this occurring while he's inside his cell?

A. **Yes, ma'am. He's at the cell, and the door's maybe open this much.**

Q. Okay. You're able to get in through that door?

A. **I am? Yes, ma'am.**

Q. With Tyrone Guinn?

A. **Yes, ma'am.**

Q. Okay. And you say he pulls away. Well, if you're undoing the cuff, could you describe how he pulled away?

A. **It was -- there was a good chunk of skin ripped out and it was hanging off a little bit.**

Q. Okay. Once this incident happened, did you stay on shift or did you go somewhere else?

A. **Captain McCraner actually sent myself and Officer Shannon home to get showers and get changed.**

Q. And did you return for your shift?

A. **Yes, ma'am.**

Q. And you worked till?

A. **8 a.m. the next morning.**

Q. You compiled an incident report in regards to this case, correct?

A. **Yes, ma'am.**

Q. Okay. Did you -- I believe you already stated you did not see Tyrone Guinn throw the container of feces?

A. **Excuse me?**

Q. You did not see Tyrone Guinn throw the container of feces?

A. **At Officer Shannon? No, ma'am.**

Q. Okay. Did he throw it at Officer Shannon, did he throw it at Inmate Hill, or was he throwing it at you? Do you know? I don't want you to assume, but do

you --

A. **No, I don't know.**

Q. There's a reference in your report that he threw the container or the feces at Inmate Hill. Is there -- is that an assumption on your part?

A. **No, it said towards.**

Q. I'm sorry?

A. **It said towards Inmate Hill. It did not say at him. It said towards him.**

Q. Towards him?

A. **Yes, ma'am.**

Q. So that would also refer to towards you and Officer Shannon?

A. **Yes, ma'am. In the direction of.**

Q. Are you aware of any -- is there any bad blood between you and Inmate Guinn?

A. **Never, no.**

Q. Are you aware of any bad blood between Officer Shannon and Inmate Guinn?

A. **No, ma'am.**

Q. How about any -- are you familiar with any bad blood between Inmate Ernest Hill and Tyrone Guinn?

A. **No, ma'am.**

Q. Okay. As you work on a tier, are you familiar with who generally has a problem with who as far as inmates?

A. **If you work the tier long enough, yes, ma'am, you do learn, but I never worked that building pretty much, so...**

Q. You never worked that building?

A. **I had, but that's not my area. That's not the designated area for me to work every day. I was just there on overtime that day.**

Q. Okay. But there was nothing that led you to believe --

A. **No, ma'am.**

Q. -- as far as that there was bad blood between Inmate Guinn and Ernest Hill?

A. **No, ma'am.**

**MS. VAN DYKE: Thank you. Nothing further.**

CROSS-EXAMINATION

BY MS. WALKER:

Q. Good afternoon, Officer.

A. **How are you doing?**

Q. Good. Thanks. How are you doing?

A. **Fine. Thank you.**

Q. All right. I just want to go over again how you guys were lined up. My understanding, and let me know if I'm wrong, is you were walking past Yard 2, correct?

A. **Yes, ma'am.**

Q. You, Officer Shannon, and Mr. Hill. Is that correct?

A. **Yes, ma'am.**

Q. And Officer Shannon was to the right of Mr. Hill?

A. **Yes, ma'am.**

Q. And you were behind Officer Shannon?

A. **I was. Yes, ma'am.**

Q. And on the right-hand side would be Yard 2 where Mr. Guinn was?

A. **Yes, ma'am.**

Q. Okay. Now, you indicated that you weren't aware of any bad blood between Mr. Guinn and Mr. Hill, right?

A. **Yes, ma'am.**

Q. And as the prosecutor indicated, you filed an incident report in this case, correct?

A. **Yes, ma'am.**

Q. Do you have a copy of that?
A. **In my back pocket.**
Q. Can you pull it out? Just take a look at it for me and refresh your recollection, and I'll ask you a couple of questions.
A. **Okay.**
Q. Okay. You indicated, as she asked you, whether or not, and I think you corrected her properly, that you threw -- excuse me -- that Mr. Guinn threw the fluid towards Inmate Hill. Is that correct?
A. **Yes, ma'am.**
Q. And everything in this report is truthful and accurate, correct?
A. **Yes, ma'am.**
Q. You wouldn't lie?
A. **No, ma'am.**
Q. In an indent report?
A. **No, ma'am.**
Q. Okay. Now -- but you testified earlier that you had received -- had gotten feces on yourself, correct?
A. **Yes, ma'am.**
Q. And Officer Shannon did as well?

A. **Yes, ma'am.**
Q. So -- but you didn't choose to write that he threw the fluid towards you and Officer Shannon?
A. **No, ma'am.**
Q. Okay. And you say that the feces and urine did not hit Inmate Guinn. Is that a typo? Should that read Hill?
A. **Yes, that was a typo. That should be Ernest Hill.**
Q. So the urine and feces did not hit Inmate Hill, but did hit Shannon in his head, face, shirt, and pants and that you received a splash of feces?
A. **Yes, ma'am.**
Q. So you premised that particular sentence about you and Officer Shannon receiving feces by the fact that Hill didn't get hit?
A. **Excuse me?**
Q. The beginning of that sentence before you --
A. **Started off with Inmate Hill?**
Q. Right.
A. **Yes, ma'am.**
Q. You talk about him first before you get to you and Officer Shannon?

A. **Yes, ma'am.**
Q. Okay. Now, I suppose, as you indicated, Officer Shannon, he was shocked, correct?
A. **Yes, ma'am.**
Q. And are you aware that he was only on the job six months at that time?
A. **I knew he was fairly new. Yes, ma'am.**
Q. Fairly new. And were you kind of like his big buddy or more experienced person to be with him? Is that the way it works there?
A. **Sometimes, yes.**
Q. Okay. Now, were you upset that feces landed on you?
A. **Not at the time because I had no idea it was on me until I looked afterwards.**
Q. And when was that that you ascertained that?
A. **After we had placed Inmate Guinn in the interview room.**
Q. Okay. But you knew right away that Shannon had it on him, obviously?
A. **Yes, ma'am. Yes, ma'am.**
Q. Okay. Now, you indicated that you then went -- at some point after Mr. Hill was placed in the shower

that you went to the yard and cuffed Mr. Guinn. Is that correct?
A. **Yes, ma'am.**
Q. And you did that by having him place his hands through the flap?
A. **Yes, ma'am.**
Q. And then you brought him out?
A. **Yes, ma'am.**
Q. Okay. And then you took him to his cell?
A. **Yes, ma'am.**
Q. Now, is there a flap on the cell door?
A. **Not on the door. No, ma'am.**
Q. Where is the --
A. **The flap is -- if this is face level at the door, the flap is on the wall over here. That's to place -- primarily to place laundry and the food trays in the cell.**
Q. Do you use it to cuff people up?
A. **No, ma'am. Never.**
Q. You actually cuff people -- excuse me. When you take people to the yard?
A. **Yes, ma'am.**
Q. They're handcuffed until they get in the yard?

A. **Yes, ma'am.**

Q. And then you uncuff them through the flap?

A. **In the yard. Yes, ma'am.**

Q. So any time that you're dealing with an individual in their cell, you'll go in there and they're not cuffed?

A. **No, there's actually a system where the door's opened. The door slides. It can slide all the way open. And then if you place -- there's a bar that places on the food flap.**

Q. Okay.

A. **And I wouldn't say it locks in there, but there's a slit for it to sit on. Therefore, the door can only open up so much.**

Q. Okay.

A. **Then that's maybe about this much.**

Q. And that's how you get them in and out and then you uncuff them?

A. **Yes, ma'am. Most of the time. Yes, ma'am.**

Q. And Mr. Guinn did not give you any problem at all when you cuffed him, correct?

A. **Not at the yard. No, ma'am.**

Q. But he gave you a hard time when you uncuffed

him?

A. **Yes, ma'am.**

Q. When he was in his cell?

A. **Yes, ma'am.**

Q. His habitat, correct?

A. **Yes, ma'am.**

Q. Okay. And you testified that he was pulling away from you and that's what caused the problem here, correct?

A. **Yes, ma'am.**

Q. And he was trying to get away from you?

A. **He was turning around, pulling away. Yes, ma'am.**

Q. He didn't try to hit you?

A. **No, ma'am.**

Q. He wasn't trying to put you -- throw you to the ground or anything?

A. **No, ma'am.**

Q. In fact, you did that to him to restrain him, correct?

A. **Yes, ma'am.**

Q. You then indicated also that Mr. -- excuse me -- that you had found some type of container. Was

that found in the yard?

A. **I had seen the container. I don't know...**

Q. You don't remember where?

A. **I seen the container in his hand.**

Q. In his hand?

A. **Before he came to cuff -- for him to handcuff him in the yard. He had thrown it down on the yard ground.**

Q. So it was on the ground?

A. **In the yard. Yes, ma'am.**

Q. And you saw it down on the ground in the yard?

A. **Yes, ma'am.**

Q. Did you recover that item?

A. **I did not. No, ma'am.**

Q. Isn't it true that when inmates go into the yard that it's important that there not be any contraband in the area?

A. **Yes, ma'am.**

Q. Okay. So someone would have had to collect that item at some point, correct?

A. **In the yard?**

Q. Yes.

A. **Yes, ma'am.**

Q. But you don't know who that was?

A. **I have no idea.**

Q. And you don't know whether that was done?

A. **If it was collected?**

Q. Right.

A. **I can't say I do, no.**

Q. Okay. Were your clothes collected?

A. **Yes, ma'am.**

Q. And are they here today?

A. **I don't see them here.**

Q. That you're aware of?

A. **Not that I'm aware of. No, ma'am.**

Q. Do you know whether the substance was ever tested, to your knowledge, the items --

A. **I can't say I do. No, ma'am.**

Q. Okay. And you indicated earlier that you never had a problem with Mr. Guinn before that?

A. **No, never.**

Q. Okay. And you weren't on the tier long enough to know the ins and outs of all of the relationships between the prisoners?

A. **Not on that tier. No, ma'am.**

this. It's unduly prejudicial. The fact that she's already called a couple of officers to testify to the nature of the confinement of that area, it's becoming prejudicial. To now come in with death row inmates and other maximum security inmates, that's not even relevant to the point of what's going on here.

THE COURT: Where are you going with this?

MS. VAN DYKE: I'm moving onto Building 19, which is where the defendant was.

THE COURT: All right. I think for the purposes of these proceedings it's not necessary to describe by category the level of security this defendant was under because that could possibly be unduly prejudicial with regard to what he was convicted of. Of course, if he takes the stand, that point becomes moot.

MS. WALKER: Right.

THE COURT: But you certainly can explore the nature of the security in that building, but not by type or category.

MS. VAN DYKE: I wasn't really sure I was going in that area, but I will move on.

THE COURT: All right.

(Sidebar conference was concluded.)

THE COURT: You may proceed when the reporter's ready.

MS. VAN DYKE: Thank you.

BY MS. VAN DYKE:

Q. Sergeant Phillips, are you familiar with Tyrone Guinn?

A. Yes, I am.

Q. And how are you familiar with him?

A. He has been housed in the SHU ever since I've been back at DCC.

Q. Okay. And do you know what building he was located in June 30th, 2004?

A. Yep, Building 19.

Q. Okay. And could you please explain to the jury what standard operating procedures apply with respect to the inmates in Building 19 of the SHU?

A. In Building 19 they are max inmates. Always have two-man backup on the inmates at that time. Actually, now it's changed to three-man backup. At that time it was two.

They receive one-hour rec three times a week. They receive three showers a week. Other than that,

they don't come out of their cells unless they have a visit, court, or some kind of administrative function they have to do in Building 20. The officers in the building feed them through a food flap. When the inmates are transported, they're transported by handcuffs. If they're staying on the tier and if they're going off of the tier, out of the building, they're shackled and handcuffed.

Q. Okay. And you said you do know Tyrone Guinn as an inmate. Do you see him in the courtroom today?

A. Yes, that's correct. He's seated in the greenish-colored shirt to my right.

Q. Thank you.

Do you recall the incident involving Tyrone Guinn, Officer Shannon, and Officer Stevens?

A. Yes, I do.

Q. On June 30th, 2004?

A. Yes, ma'am.

Q. And what was your involvement in that incident?

A. I was called as backup. I was on the A and B side. This happened on the C and D side, and I was called on the radio as backup. I responded. Officer Stevens explained to me that, which I could see, that

Officer Shannon had just had feces thrown all over him. And when I walked into the tier, I saw Officer Shannon with feces dripping down from the back of his head, over his face, onto his clothes. And Officer Stevens had on his right -- back of his right leg feces on it, on the clothes.

Q. Okay. Was there feces anywhere else?

A. Yes, there was feces hanging from the Yard 2, which was where Inmate Guinn was, all over the floor and all over the cell doors of 4 and 8.

Q. Okay. You said there was feces all over Yard 2. Why on yard --

A. Each yard in the building is surrounded by a cage, kind of like a dog kennel cage. And it goes from floor to ceiling. And it was hanging from the actual cage itself, dripping down to the floor, just dripping down.

Q. Okay. How did you know what it was?

A. It smelled like feces.

Q. Okay. And were you certain of that?

A. Absolutely.

Q. Okay. Did you take any photographs with respect to the feces that was thrown?

Q. Well, who was the fortunate person that got to cleanup? Do you recall? Do you know that?

A. **Myself and a Sergeant Percheck acquired two other inmates to cleanup the feces on the floor, the cell doors, and the yard.**

Q. Okay. And do you know what procedure they had to follow in order to cleanup something like that?

A. **We obtained biohazard suits, red evidence or red biohazard bags that were provided by medical. Any time you have a biohazard we get those bags to use. We used bleach and water to mop everything down. After everything was cleaned up, everything that we used was put in red biohazard bags and sent to medical for them to dispose of.**

Q. Okay.

A. **Which is their procedure.**

Q. The bag that you were just describing, the biohazard red bag, was that the same bag?

A. **They were the same type, except on the biohazard bags that we put the clothes in, we tagged them with an evidence tag so we would know the evidence. And that was taken out by Staff Lieutenant Rispoli, at the time he was lieutenant, where the cleanup bags had**

**to be taken out of the building until later on that night.**

Q. Now, there's been some discussion you haven't been in the courtroom for in regards to the incident reports that are created. You've already created an incident report as well, correct?

A. **That's correct.**

Q. And there's been mention in Officer Shannon's report as well as Officer Stevens' report that Inmate Guinn had thrown the feces toward or at Inmate Hill. Is that an assumption on your part, that the feces was thrown at Inmate Hill?

A. **I have no idea who it would have been thrown at. When we take the inmates out to rec, the officers are with the inmates. So if you threw it in the direction of an inmate, you're going to hit an officer.**

Q. And you were not present for the incident?

A. **No, I came in after the incident. After the feces had been thrown, I was called.**

Q. And so you have no idea what the defendant's intention was at the time that it happened?

A. **No.**

**MS. VAN DYKE: May I have a moment, Your Honor?**

**THE COURT: Certainly.**

BY MS. VAN DYKE:

Q. We've already talked about the clothing, pictures. Do you recall seeing any type of container or cup?

A. **There was, I believe it was a milk carton that he had. It's been a while.**

Q. Did you actually see a milk container or carton? If you don't recall --

A. **I don't recall, but I believe it was a milk carton.**

Q. So that was not something that you collected?

A. **No, we were -- my personal concern at the time was Inmate Guinn was in the interview room. He wasn't going anywhere. And my concern was getting Officer Shannon out of his clothes and making sure that Officer Stevens' hand was seen by medical.**

**MS. VAN DYKE: Okay. Thank you very much. Nothing else.**

**MS. WALKER: Thank you, Your Honor.**

CROSS-EXAMINATION

BY MS. WALKER:

Q. Good afternoon, Sergeant.

A. **Good afternoon.**

Q. I think you already indicated to the jury that you were not present when the alleged feces throwing occurred. That's correct, right?

A. **That's correct. It was thrown by the time I got to the scene. That's why I was called.**

Q. And you were called because you are a supervisor?

A. **That's correct.**

Q. Okay. And you responded to assist your officers, right, that's your job?

A. **That's correct.**

Q. And you were concerned about Officer Shannon because he was in a state of shock?

A. **Correct.**

Q. And by the way, Officer Shannon was relatively new to the job at the time, correct?

A. **I believe he had approximately four or five months.**

Q. Okay. And was -- let me take that back. You did file an incident report in this case, correct?

A. **That's correct.**

Q. And you collected some evidence in this case?

113

A. **That's correct.**

Q. You indicated to the jury that you had collected clothing, for example?

A. **That's correct.**

Q. You also took some pictures?

A. **That's correct.**

Q. And you said that you arrived after the incident, like within a minute or so?

A. **That's correct, or less.**

Q. But after you arrived, you went and helped Shannon and Stevens?

A. **Yes.**

Q. Okay. And about how long did that take, would you say?

A. **Maybe five or 10 minutes just to get Officer Shannon, and medical came down to see Officer Stevens.**

Q. Were you present when medical saw them?

A. **I was not present when medical saw Stevens. I went with the captain that came down to move Inmate Guinn to the isolation unit.**

Q. So you did that as well, right, after taking care of Officer Shannon?

A. **That's correct.**

114

Q. And how long do you think that took you?

A. **Maybe five minutes.**

Q. Okay. So you'd say about 10 or 15 minutes that all took you?

A. **Yes.**

Q. And then at some point you took pictures of the scene, correct?

A. **That's correct.**

Q. Okay.

MS. WALKER: And, Your Honor, may I retrieve the photos?

THE COURT: Yes, you may move freely about the courtroom.

MS. WALKER: Thank you.

BY MS. WALKER:

Q. All right. Since the jury's already seen this, I'd like to approach and show you, I guess they're Exhibits 1 and 2 again and, specifically, Exhibit 2. I think you talked to the prosecutor about this, but I want to make sure that the jury understands. In the middle of the photo there's a very light --

A. **The white -- the white color in the picture is the reflection from the light on the floor.**

115

Q. Okay. So that's not intended to be a substance?

A. **No.**

Q. There's not a container of some kind?

A. **Right.**

Q. That's not contraband, to the best of your knowledge?

A. **I believe it was the --**

Q. Light?

A. **The light from the floor or the light from the ceiling hitting on the floor.**

Q. How often would you say these floors are cleaned?

A. **They're cleaned every night. We have inmate workers that come out every night and clean those floors.**

Q. Okay. And then the second picture, I can't really see it. What is supposed to be the feces?

A. **The feces is on the wall to the -- what would be the left of the door on the wall here and on the floor by the door. There's actually a lot of it by the door, the door track, under the door track, and the walls are splattered.**

116

Q. Now, would the wall have been -- let's say I'm between -- would you be between the wall and the fence if you were walking down the --

A. **Yes, the officer would have been on the right side of Inmate Guinn. Inmate Guinn would have been closest to the wall. And our officer, Shannon, was next to the cage. I'm sorry. Inmate Hill would have been closest to the wall. Inmate Guinn would have been in the yard.**

Q. All right. So Officer Shannon and Officer Stevens were closest to the yard, to the best of your knowledge?

A. **That's correct.**

Q. From what you understood. And Mr. Hill was to the left?

A. **To the left, on the side of the wall.**

Q. Of the officer. And it's on the left-hand side that the feces hit the wall?

A. **Yes.**

Q. So it would have been more to Mr. Hill's left?

A. **It would have been -- it would have had to go past our officer to get to Inmate Hill.**

Q. Past the officer, past Mr. Hill to get to the

wall, correct?

A. Yes.

Q. You also indicated that the -- that Officer Stevens was bandaged up at the nurse's station or by the nurse?

A. Correct.

Q. He received a band-aid, correct?

A. I don't recall what they put on him.

Q. Okay. Do you have a copy of your incident report with you?

A. Yes, I do.

Q. Okay. Could you take that out and take a look at it? You indicated in your report -- well, first of all, in your report do you mention that you can see, and you can take your time to look at this, a container being involved at all?

A. No, the only evidence that I listed was clothes and pictures.

Q. Okay. Thank you.

And near the top of the report you do point out that when you were -- well, first of all, this report was done as part of an investigation or, excuse me, as part of a procedure that the Department of Corrections

uses any time there's an incident?

A. That's correct. Any time we have an incident or an inmate's going to receive disciplinary action, we do. Everybody that's involved in the incident does an incident report.

Q. Okay. So not just criminal instances are documented?

A. No, an incident report can be for anything.

Q. And this incident report helped you in internally disciplining Mr. Guinn?

A. There's an incident report done and then there's an disciplinary report done. The disciplinary report is forwarded to the hearing officer. The hearing officer does the discipline from that report and the incident reports that are written.

Q. So to the best of your knowledge, Mr. Guinn was disciplined?

A. As far as I know. He went to isolation and then from there --

Q. Do you know how long he was there?

A. More than likely 15 days at least.

Q. Now, you also indicated near the top of the report, like the sentence second I believe it is, that

you learned from Officer Stevens in your investigation that Mr. Guinn had thrown the feces at Mr. Hill. Is that correct? And there is more after that.

A. That is what Officer Stevens told me.

Q. Okay. But he also goes onto tell you that he missed Inmate Guinn and that it had hit both of the officers, correct?

A. That's what Officer Stevens told me, that he did not hit Hill. He hit both him and Shannon.

Q. But he didn't come into you and say, This inmate came and threw feces at me; he was honest in telling you what he thought happened?

A. Yes.

Q. You don't think he was dishonest, do you?

A. No.

Q. Now, you indicated that you took some pictures and that you bagged up the clothes. And the clothes, you wouldn't know what happened to them after Rispoli got to them, right?

A. Once I give them to Staff Lieutenant Rispoli, they're out of my hands. I have nothing else further to do with the property as far as evidence goes. What should have happened was it went to the hearing officer

until the hearing took place just in case he needed the evidence as -- for the hearing that he would have had with Inmate Guinn.

Q. Okay. Now, the -- you took some pictures. You took pictures of the feces on the ground and on the wall, right? And you took a photo, which the jury has seen, of the little cut that he has on his hand, correct?

A. That's correct.

Q. Did you take any pictures of the officers with the feces on them and their clothes?

A. No, all we wanted to do is get Officer Shannon out of his clothes.

Q. You wanted to get him out of it.

And you didn't -- so you didn't actually see the incident, correct?

A. I did not see the incident.

Q. And did you see Officer Stevens cuffing Mr. Guinn when he put him back in his cell?

A. Officer Guinn -- Inmate Guinn was in the interview room when I arrived.

Q. Okay. So you didn't see that. You also indicated to the jury that there were inmates that were

Q. So he would have been put in isolation without a hearing?

**A. Yes, they're put in -- on administrative transfer in the beginning.**

Q. Okay.

**A. And then if -- if the hearing officer warrants 15 days isolation, then that time is credited to that -- to that charge.**

Q. Okay. You indicated that Mr. Hill was put in the shower as a precautionary measure?

**A. Yes.**

Q. Do you have any idea where he was headed before this incident occurred?

**A. He was actually going to the shower.**

Q. Okay. So he was already going there?

**A. Yes.**

**MS. WALKER: Nothing further.**

**MS. VAN DYKE: Your Honor, nothing further of this witness.**

**THE COURT: You may step down.**

THE WITNESS: Thank you.

THE COURT: Do you have another witness?

MS. VAN DYKE: May we approach, Your Honor?

THE COURT: Yes.

(Whereupon, the following sidebar conference was held.)

MS. VAN DYKE: At this point the State probably may decide to close its case-in-chief. I would like some time to do that, to think about whether or not I'm going to do that at this point. Also, I think probably a couple of issues have come up that I think I need to address before I can make that decision, and I don't know if we can hopefully in the time we have left address that with Your Honor. I don't know if it would be a good time to dismiss the jury.

THE COURT: All right. We'll dismiss the jury for the day.

MS. VAN DYKE: Thank you.

(Sidebar conference was concluded.)

THE COURT: Ladies and gentlemen, we have a few issues that we need to address and so you are going to be dismissed for the day. We will reconvene tomorrow morning at 10 o'clock. The bailiff will instruct you where and when to go.

Again, please keep an open mind. Try as best you can not to make -- to form any opinion about this

case one way or another. Avoid contact with anyone in this room. And, also, do not discuss this case with anyone, even among yourselves. Do not discuss this case with anyone.

All right. Have a good evening.

(Whereupon, jury leaves the room at 4:14 p.m.)

THE COURT: I'm prepared at this time to address the issue of whether or not these incident reports are going to be admitted. Is that an appropriate first order of business?

MS. VAN DYKE: Sure, Your Honor.

THE COURT: I'd like to ask counsel whether or not Department of Corrections officers are considered law enforcement personnel.

MS. WALKER: They are, Your Honor. I concede that.

THE COURT: Well, if that is the case, then even though these are reports, they don't fall within the exception of 803(8) because the following are not within the exception to the hearsay rule: investigative reports by police or other law enforcement personnel. Is it your argument these are not investigative reports?

MS. WALKER: That is correct, Your Honor. To

me, the way I read that is that it would be an investigative report for the purpose of the criminal case. In this particular case, that wasn't -- that wasn't what the purpose was they filled that out. They filled it out as part of an incident report, whether administratively or criminally. And it just so happens that the State has it. They clearly weren't going to use it in their case as investigative material. So I believe that it wouldn't be -- wouldn't fall into that category.

THE COURT: Well, let's assume it doesn't. It's still an out-of-court statement offered to prove the truth of the matter asserted. So which exception do you think it falls under again?

MS. WALKER: Records regularly -- kept in the regular course of business, Your Honor. They testified that these are records that they actually authored themselves that they use as part of administrative procedures that are kept as part of the DCC records.

THE COURT: Does the State have a position?

MS. VAN DYKE: Your Honor, these are, in essence, investigative reports. It's basically what -- their first impression of what happened in that

1

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE, ID No. 0411013992

Plaintiff,

v.

TYRONE L. GUINN,

Defendant.

BEFORE: HONORABLE MARY M. JOHNSTON, J. and jury

APPEARANCES:

CARI VAN DYKE, ESQ.
Deputy Attorney General
for the State

NICOLE WALKER, ESQ.
for the Defendant

TRIAL TRANSCRIPT
MAY 20, 2005

JEANNE CAHILL, RMR, CRR
SUPERIOR COURT OFFICIAL REPORTERS
500 King Street - Wilmington, Delaware 19801
(302) 255-0561

2

May 20, 2005
Courtroom No. 8E
9:45 a.m.

PRESENT:

As noted.

\- - - - -

THE COURT: Good morning.

Over last evening I'm sure you've all thought about these issues, as I have. I also looked for a pattern instruction on transferred intent, and was unable to find one. I have drafted something, should that end up being appropriate.

MS. VAN DYKE: Your Honor, the State is not going to seek a transferred intent instruction.

THE COURT: All right.

MS. VAN DYKE: That kind of closes that issue.

THE COURT: All right. So you're going to rely on the proof of the intent to assault the law enforcement officers?

MS. VAN DYKE: Yes.

THE COURT: And what about the defense asking for any --

3

MS. WALKER: Well, Your Honor, if she relies solely on that, they either have to believe that he intended to hit that officer to find him guilty of that, or he's not guilty at all, so there would be no offensive touching at all.

THE COURT: So you're not asking for that?

MS. VAN DYKE: You still have to prove intent on an offensive touching, so it's not a lesser-included.

I'm sorry this couldn't be decided yesterday.

THE COURT: That's all right. It was certainly interesting for me to research it, anyway.

MS. VAN DYKE: I think it's going to have the Legislature rolling.

MS. WALKER: They're probably down there right now. That's what I was afraid of.

THE COURT: It is interesting. And it is an issue of first impression. I do think that it's pretty clear. You cannot use transferred intent to escalate and add a new element to a charge. I think that's pretty clear.

4

MS. WALKER: This is kind of backward. Usually, the State is trying to get transferred intent.

MS. VAN DYKE: I know.

THE COURT: Was there anything else about these instructions that we need to go over?

MS. VAN DYKE: Actually, my first name is spelled wrong.

THE COURT: How is it spelled?

MS. VAN DYKE: It's C-A-R-I. Not the typical spelling.

MS. WALKER: The Court already indicated the "Office of the Public Defender" is coming out.

THE COURT: Yes.

MS. WALKER: The only other thing that I noted is whether defendant's election to testify goes in. And if we could, after the State rests, which I believe they're going to do, and after we have arguments with regard to -- I'd like to put on the record officially my motions for judgment of acquittal, if I could have an opportunity to talk to my client one last time.

THE COURT: Normally what I do is put it in

Court.

Your Honor, I'd like to deal with the first two counts, which I think would be based on the same conduct. The State has to establish a prima facie case that my client intentionally hit a Correctional officer and intended to hit a Correctional officer with the feces.

There is no argument that there was feces involved here. At this point, I think they may have established a prima facie case that my client is the one that threw it, even though nobody saw it. I think that the jury could infer that he was the only one there; that he hit them.

However, the only testimony with respect to intent that was elicited was that he, my client, intended to hit Mr. Hill and not the Corrections officer. None of them -- No evidence was placed on the record that he intended to hit the Corrections officer. It's not there.

Even if we don't -- the jury doesn't accept their conclusions that Miss Van Dyke is going to say, that's all it was, was a conclusory statement by the CO's, if they take that out, then there is

nothing, there is no intent.

For all we know, my client could have been in there just throwing the feces, not knowing anybody was going to be coming up the walkway as they were walking down.

No intent has been established at all or presented to the Court with respect to those two charges. So I clearly think that they haven't even put forth a prima facie case with respect to that element of the offense.

Now, on the third count, Your Honor, the State has to establish a prima facie case that it was my client's conscious object to cause physical injury to the officer, Corrections officer.

Again, the only evidence that was presented is the testimony of Officer Stevens that when he went to take the cuffs off of my client, he pulled away. And that's how -- and he hung onto the cuffs because he was doing his job.

He didn't indicate my client pulled away because he was trying to get away from the officers. He didn't to testify that. In fact, he testified he didn't try to strike them or struggle

with them at all. And in fact, they said he cooperated in getting cuffed. However, he didn't cooperate in being unhandcuffed.

The officer also testified, Your Honor, that when they put them in the cell to uncuff them, they are turned away from them, and they uncuff the one, which is what he said happened here, and they turn around and uncuff the other.

For all we know, Your Honor, that's all that happened, and he pulled away in that respect. Because nothing was presented that there was intent on his part to pull in, to shake the handcuffs as a weapon, to, you know, go in and get some other weapon and try to hurt the officer.

So again, Your Honor, in both cases, this comes down to intent. And in both cases, all three cases, I should say, the State has failed to present any evidence, any evidence, of intent by my client to either strike Corrections officers or to hurt or cause physical injury to an officer.

Therefore, Your Honor, I'm asking for a judgment of acquittal on all three charges.

MS. VAN DYKE: Your Honor, the State would

request that you deny that motion. The standard of review the Court must consider is the evidence at this point must be viewed in the light most favorable to the State.

The State presented evidence of the two alleged victims in this case, Correctional Officer Shannon and Correctional Officer Stevens.

As far as the defendant being the person that committed the crimes, he's the only person in the Yard 2. There is evidence that he was seen holding a container, and there was feces all over the fence of the yard in which he was contained.

As far as intent to hit the Correctional officers, that intent can be inferred, and that is a decision for the jury to grapple with.

Based upon the surrounding circumstances, the close proximity that the victims were to the defendant's recreation yard, the fact that Ernest Hill, his alleged intended victim, is next to them and he is not the closest person to the recreation yard, this was a calculated plan, obviously.

This was something he had to think about, gather up his feces to contain, and then he threw

17

it intentionally at the victims. So the State does believe that there is an inference that can be drawn by the jury.

And as to Count III, it is the defendant's actions that caused the injury. It is clear from Officer Stevens' testimony that the defendant's sudden movement caused him concern for safety, and that he needed to make sure those cuffs were back on the inmate. The inmate continued to struggle, and that resulted in the injury.

Given all that, Your Honor, the State believes at this point, if the Court views the evidence in the light most favorable to the State, the motion should be denied.

Thank you.

MS. WALKER: May I respond?

THE COURT: Yes.

MS. WALKER: With respect to Miss Van Dyke's statement that the evidence has to be viewed in the light most favorable to the State, she is absolutely right, but they have to present evidence for it to be viewed in the light most favorable to that, and they haven't done that.

18

The intent in this case is specific intent to hit a Corrections officer.

The sudden movement, there was no testimony by the officer that he made a sudden movement and that's what caused his cut. And everything he testified to, it was because my client pulled away. We have no idea why he pulled away. Nothing was put into evidence regarding intent.

She also indicated it was planned and calculated by my client to gather up his feces and hit the officer. It may have been calculated and planned to throw feces somewhere or do something with it, but she has established no evidence of calculation and planning.

THE COURT: All right. My ruling is as follows: I do think that intent is a classic factual question which should go to the jury. The question is whether the State has established a prima facie case.

With regard to Count III, the question is whether it was the conscious object to cause physical injury. There has been testimony that the defendant is cuffed and uncuffed on a daily basis,

19

and there was testimony that his behavior deviated from the normal procedure.

And, therefore, I think the State has established a prima facie case for purposes of this motion. So the motion for judgment of acquittal is denied as to Count III.

With regard to Counts I and II, the question is intent. I do agree that there is certainly a question of fact raised even by the State's own witnesses with regard to specific intent. However, I think that under the circumstances, the intent may be conferred from the proximity of the guards to Inmate Hill and also the nature of the conduct itself.

So there, the State has presented sufficient evidence to survive a motion for judgment of acquittal, so the motion is denied as to Counts I and II as well.

Is there anything else we need to discuss before we bring the jury in?

MS. VAN DYKE: No, Your Honor.

MS. WALKER: No, Your Honor.

THE COURT: All right.

20

MS. WALKER: Your Honor, there is one more thing that I did want to address, and that is in discussing with my client the evidence presented and not presented by the State and explaining to him his right to testify or not testify, he has chosen not to testify in this case. Therefore, I think the instruction as contained in the jury instruction should remain.

THE COURT: All right. If the defendant could please rise, we'll conduct that colloquy now.

MS. VAN DYKE: Your Honor, are they bringing in the jury?

THE COURT: Yes. We'll have to stop them when they get to the door.

Could the investigating officer tell them?

MS. WALKER: Thanks.

THE COURT: Mr. Guinn, your counsel has informed the Court that it is your present intention not to testify. Is that correct?

THE DEFENDANT: Yes, ma'am.

THE COURT: Within the last 24 hours, have you taken any intoxicating substances, any drugs or alcohol?

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE, I.D. #0411013992

v

TYRONE GUINN,

Defendant.

BEFORE HONORABLE MARY M. JOHNSTON, J

APPEARANCES

CARI VAN DYKE, ESQ.
Deputy Attorney General
for the State

NICOLE WALKER, ESQ
for the Defendant

- - - - - - - - - - - - - - - -

SENTENCING TRANSCRIPT
JULY 1, 2005

- - - - - - - - - - - - - - - -

SUPERIOR COURT REPORTERS
500 North King Street, Suite 2609
Wilmington, Delaware 19801-3725
(302) 255-0599

JULY 1, 2005
Courtroom No. 4A
9:30 a.m.

PRESENT:

As noted.

- - - - -

MS. VAN DYKE: Your Honor, State moves the sentencing of Tyrone Guinn. That's number six on your calendar.

MS. WALKER: Your Honor, I wanted to see if the Court received a submission from me regarding a psycho forensic evaluation.

THE COURT: I don't believe so, if it's not in the presentence report.

MS. WALKER: I don't know what happened to it. I had done a letter. If I could pass up to the Court a summary.

THE COURT: Yes.

MS. WALKER: And the State has received a copy of that.

THE COURT: I have reviewed this report and it is consistent with all of the other information in the presentence file. The information is in a

RECEIVED AUG 1 8 2005

little more detail but it's of the same nature

MS. WALKER: Thank you, Your Honor.

THE COURT: All right. You may proceed.

MS. WALKER: Your Honor, thank you. As the report has shown -- I do apologize that that copy didn't get to you earlier. I did have it put together. I don't know what happened in our office but it didn't make its way to you.

However, the psycho forensic evaluation the Court just read demonstrates she based her summary on several things.

Mr. Guinn unfortunately has been incarcerated most of his life. Unfortunately, this seems to be a repetitive type of scene that we see in the criminal justice system. And what happens as a result of that, and specifically in Mr. Guinn's case, they get institutionalized.

As a young child he did have parents that I don't think were adequately equipped to raise a child, as indicated in the report. There were concerns about physical abuse and while the documents substantiate this, indicate that perhaps his mother had hit him with an electrical cord.

That alone obviously wouldn't excuse any behavior. None of this excuses behavior. But I think it goes to show how he got to the point he got to when the crime occurred.

He did have problems. He had an intellectual deficiency. A psycho neurological report was done by Dr. Munch as he was a child indicating that he had an intellectual deficiency, poor verbal communication skills and as a result of that tends to get frustrated which leads to more acting out through more physical ways in anger and confusion.

Because of his poor intellectual skills he didn't do very well in school. He was teased by his peers, and, again, causing some more anger and confusion.

Your Honor, my concern is the fact that he has spent quite a bit of time incarcerated. And I think he went right from the juvenile justice system to DCC, which is why he was there at the time this incident occurred. And now he's being held in this case. He was to be released in February. Your Honor, he did do something that is

A-28

[illegible] the criminal justice system works is that sentencing is to take into consideration all of the factors of the individual, not what we normally do for most people, and just give a standard maintain employment. His background indicates that it would be very difficult for him when he's first released. He obviously needs to get skills.

I totally agree with Ms. Van Dyke that he does need some close supervision, and that's why I think Level IV is appropriate. Again, keeping him in prison beyond one year is just -- is not going to help him get it. He needs to learn how to live like a human being without being incarcerated.

THE COURT: Well, I do understand why Mr. Quinn has -- his life has turned out like it has and certainly I think that is extremely unfortunate. And it's pretty clear that the way he's ended up is not entirely his fault. He was dealt a pretty bad hand of cards in terms of his abilities and also in terms of his family situation.

Having said that, however, this is the third assault in a detention facility in a relatively

short amount of time. And while I am not convinced that many sentences have a direct deterrent affect for people on the street, I do think that for this particular crime significant punishment will have a deterrent effect for persons in the detention facilities.

And I think the Court has to treat these crimes very seriously because they directly effect the safety of other corrections officers who literally put their lives on the line every day.

For that reason, and also because there's no suggestion that this defendant can conform his conduct, and that anything other than continued incarceration is appropriate, my sentence is as follows: IN04111483, eight years at Level V suspended after three years for three years at supervision Level IV Halfway House. Hold at supervision Level V pending placement at IV, suspended after one year at Level IV for two years at Level III, the first year is a minimum mandatory. And obviously the Level V time is concurrent to Level V time being presently served.

I would like a mental health evaluation at

Level [illegible]. Specifically I would like a psychiatric evaluation to determine whether the defendant would benefit from medication. The defendant is to work toward a G.E.D. or engage in job training.

MS. WALKER: Your Honor, the effective date on that?

THE COURT: The effective date is today. I don't think he has credit for time served. He is presently serving a Level V sentence; is that correct?

MS. WALKER: No. I think he actually completed that. I think psi indicates it was in February, February 18th.

THE COURT: Oh, well. That's my mistake. Does the State agree with that?

MS. VAN DYKE: I'm sorry, Your Honor. I was looking at something else.

THE COURT: I have February 18th.

MS. VAN DYKE: You're asking for credit for time served after the one year minimum mandatory?

MS. WALKER: No. He was released on the other case February 18th and I am asking that that be his effective date for this sentence.

MS. VAN DYKE: I think it can be as to the remaining Level V time but not as to the minimum mandatory time.

THE COURT: I am going to let the Department of Corrections figure out the credited time. I am just going to put credit. So the effective date of the sentence -- let's put credit for how long that would be. And that would be from you said February 18th?

MS. WALKER: Four and a half months.

THE COURT: I believe that's two weeks. That's 14 days; is that correct? No. All right. With credit for four months and 12 days previously served.

MS. WALKER: Thank you, Your Honor.

MS. VAN DYKE: Did the Court address the testing for communicable diseases?

THE COURT: Oh, yes. Thank you. I did mean to pronounce that. Testing for communicable diseases at defendant's expense.

MS. VAN DYKE: Thank you, Your Honor.

CERTIFICATE OF SERIVE

I, Tyrone Guinn, Petitioner hereby Certify That on 9/30/06 I have served one copie of The Foregoing Petitioner opening Brief Appendice were mailed to:

United States District Judge
Kent Jordan,
At Unite States District Court
844 N. King St. Lockbox 18 wilm,
DEL. 19801-3570.

Tyrone Guinn
Tyrone guinn SBI: 375731
Petitioner,

9/30/06



TYRONE GLLINN SBI: 375731
DELAWARE CORRECTIONAL CENTER
1181 Paddock ROAD SMYRNA, DE 19977.

U.S.M.S. X-RAY

to:

Office of the Clerk
United States District Court
844 N. King Street, Lockbox 18
Wilmington, Delaware 19801-3570

OFFICIAL BUSINESS

U.S.M.S. X-RAY